# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| MARVA JEAN SAUNDERS, et al., individually and/or on behalf of other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, and MID-CENTURY INSURANCE COMPANY,<br><br>Defendants. | Case No. 97-1104-CV-W-FJG |

## ORDER

Currently pending before the Court is defendant Farmers Insurance Exchange, Fire Insurance Exchange and Mid-Century Insurance Company (collectively referred to as "Farmers") Response to Remand Order and Motion to Dismiss Plaintiffs' Revised Second Amended Complaint (Doc. # 79).

### I. BACKGROUND

This case has a long history. It was part of a group of cases which were initially filed in 1996 when numerous plaintiffs sued twenty-five insurers under the Fair Housing Act, 42 U.S.C. § § 3601 *et seq.*, and the Civil Rights Acts of 1866 and 1870, 42 U.S.C. §§ 1981 and 1982. Plaintiffs initially sought class action relief for the defendants' allegedly discriminatory policies arguing that the defendants engaged in discriminatory redlining practices with the effect of denying them homeowners insurance. This Court denied the plaintiffs' motion for class certification and the case was dismissed without

prejudice on the basis that the "plaintiffs lack standing to bring claims against defendants against whom they have alleged no direct injury." Canady v. Allstate Ins. Co., No. 96CV0174, 1997 WL 33384270, *8 (W.D.Mo. June 19, 1997), aff'd, 162 F.3d 1163 (8th Cir. 1998), cert. denied, 525 U.S. 1104 (1999)("Canady I"). Thereafter, ten plaintiffs filed class actions in state court against eighteen Canady I defendants, alleging that the same practices violated Missouri law. The court enjoined plaintiffs from relitigating in state court the same causes of action against multiple unrelated defendants. Canady v. Allstate Ins. Co., 1999 U.S. Dist. LEXIS 23031 (W.D.Mo. 1999). Again, the Eighth Circuit affirmed this decision in Canady v. Allstate Ins. Co., 282 F.3d 1005 (8th Cir. 2002)("Canady II"). The plaintiffs then filed ten new actions in this court, each asserting virtually identical claims against a single defendant. This Court ordered plaintiffs to file Revised Second Amended Complaints eliminating all claims of indirect injury. This Court then dismissed the amended complaints with prejudice for lack of Article III standing. The Eighth Circuit affirmed the dismissal of the claims against American States Insurance Group (the McClain Action), Safeco Insurance Company (the Kenner action), and the Chubb Group (the Canady action). McClain v. American Economy Insur., 424 F.3d 728 (8th Cir. Sept. 7, 2005)("Canady III"). Three other cases which had been filed were settled.

On March 31, 2005, this Court dismissed plaintiffs' Revised Second Amended Complaints against Farmers, American Family and Shelter General Insurance Company in three of the remaining cases based on the Filed Rate Doctrine. On March 8, 2006, the Eighth Circuit Court of Appeals reversed the dismissal of the price discrimination claims, but otherwise affirmed this Court's decision. However, in that Order, the Eighth

2

Circuit raised the question whether the McCarran Ferguson Act applied, stating:

> Congress addressed the extent to which enforcement of federal statutes may be permitted to impact state regulation of insurance in the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, enacted in response to the Supreme Court's ruling in <u>United States v. South-Eastern Underwriters Ass'n.</u>, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), that insurance is interstate commerce under the Commerce Clause. Intending to leave the regulation of insurance primarily to the States, Congress provided, with exceptions not relevant here, that no federal statute, "shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such [federal] Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). The Fair Housing Act, § 1981, and § 1982 do not specifically relate to the business of insurance, nor do they "invalidate" or "supersede" the Missouri laws regulating insurance. *Thus, the question under the McCarran-Ferguson Act is whether enforcement of these federal statutes in the manner urged by plaintiffs would "impair" the State's regulation of insurance.* State regulation is impaired only if the federal law "directly conflict[s] with state regulation," or if its application would "frustrate any declared state policy or interfere with a States' administrative regime." <u>Humana Inc. v. Forsyth</u>, 525 U.S. 299, 310 (1999). Whether the adjudication of plaintiff's pricing claims would impair Missouri's regime of insurance rate regulation under <u>Humana</u> is a fact-intensive issue that defendants did not raise in the district court or on appeal. The requisite level of interference is certainly more than possible.

<u>Saunders v. Farmers Insur. Exchange</u>, 440 F.3d 940, 945 (8th Cir. 2006)(emphasis added). The Eighth Circuit noted that the record on appeal did not provide answers to several questions necessary to decide the McCarran-Ferguson issue. The Eighth Circuit's specific questions included: 1) the nature of plaintiff's price discrimination claims; 2) the specific relief requested; 3) the extent of Missouri's insurance rate regulation; 4) whether insureds may bring an action in state court to challenge an insurance rate as discriminatory or unreasonable and 5) whether Missouri statutes permit judicial review of the agency's determination of these issues. <u>Id</u>. at 946.

In response to the Eighth Circuit's Order, Farmers filed a Motion to Dismiss arguing that the plaintiffs' Price Discrimination Claims are barred by the McCarran-

3

Ferguson Act. This is the question which the Court now addresses.

## II. STANDARD

Farmers states that it is seeking dismissal pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). As this is purely legal question, the Court will treat defendant's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

"The issue on a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is not whether a plaintiff will ultimately prevail, but rather whether the plaintiff is entitled to offer evidence in support of his or her claims." Doe v. Hartz, 52 F.Supp.2d 1027, 1049 (N.D.Iowa 1999), citing, Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); United States v. Aceto Agr. Chem. Corp., 872 F.2d 1373, 1376 (8th Cir. 1989). "A motion to dismiss for failure to state a claim should be granted only if it is clear that no relief could be granted under any set of facts, construing the allegations in the complaint favorably to the pleader." County of St. Charles, Missouri v. Missouri Family Health Council, 107 F.3d 682, 684 (8th Cir.), cert. denied, 522 U.S. 859 (1997) (citations omitted). "Thus, '[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.'" Doe, 52 F.Supp.2d at 1050, citing, Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995)(internal quotations, ellipses and citations omitted). "The purpose of a 12(b)(6) motion is to determine whether the plaintiff has stated a claim upon which relief may be granted.

## III. DISCUSSION

**A. McCarran Ferguson Act**

The McCarran Ferguson Act states in part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b).

**B. Pre-Humana Decisions**

The Supreme Court in Humana v. Forsyth, 525 U.S. 299, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999), clarified the test courts are to use when analyzing whether the McCarran Ferguson Act applies. Several courts prior to the Humana decision determined that the McCarran Ferguson Act did not require dismissal of civil rights actions or Fair Housing Act claims. However, many of these courts adopted a direct conflict test. In Mackey v. Nationwide Insurance Companies, 724 F.2d 419 (4th Cir. 1984), the Court stated "[w]e are not pointed to any law enacted by North Carolina which would be 'impaired' by application of the Fair Housing Act or the Civil Rights Acts. The presence of a general regulatory scheme does not show that any particular state law would be invalidated, impaired or superseded by the application of the Fair Housing Act and the Civil Rights Acts. See also Nationwide Mutual Insurance Co. v. Cisneros, 52 F.3d 1351, 1363 (6th Cir. 1995), cert. denied, 516 U.S. 1140 (1996)("the presence of additional remedies in the Fair Housing Act does not cause the Act to invalidate, impair or supersede Ohio insurance law.").

In fact, this Court in a decision rendered eleven years ago in a related case, Canady v. Allstate Insur. Co., No. 96-174-CV-W-2, (W.D.Mo. Oct. 2, 1996), determined that the McCarran-Ferguson Act did not bar plaintiff's claims. The opinion noted:

5

> Defendants also maintain that the remedies available under the FHA will impair, impede, and supersede Missouri's administrative review process and regulation of insurance in violation of the McCarran-Ferguson Act. Defendants acknowledge that the Sixth and Seventh Circuits have been confronted with this same issue and have decided to the contrary of defendant's opinion. The circuit courts found that the availability of FHA remedies which are different from, or in addition to, state law remedies does not cause the FHA to conflict with state insurance law. . . . Although defendants again try to distinguish these circuit cases, the Court agrees with their reasoning and finds them applicable.

Id. at 13-14.

**C. Humana Decision**

In Humana Inc. v. Forsyth, 525 U.S. 299, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999), the Supreme Court considered whether Humana violated Nevada law and the Racketeer Influenced and Corrupt Organizations Act ("RICO") when it failed to disclose and pass on discounts for hospital services. The "key question" the Supreme Court stated was "whether RICO's application to the scheme in which the Humana defendants are alleged to have collaborated, to the detriment of the plaintiff policy beneficiaries, would 'impair' Nevada's law?" Id. at 308. In considering this issue the Court stated:

> While we reject any sort of field preemption, we also reject the polar opposite of that view, *i.e.*, that Congress intended a green light for federal regulation whenever the federal law does not collide head on with state regulation. The dictionary definition of "impair" is "[t]o weaken, to make worse, to lessen in power, diminish, or relax or otherwise affect in an injurious manner." Black's Law Dictionary 752 (6th ed.1990). The following formulation seems to us to capture that meaning and to construe, most sensibly, the text of § 2(b): When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.

Id. at 309-310.

The Supreme Court concluded that allowing the policy beneficiaries to bring suit

6

under RICO would not impair Nevada law and therefore the suit was not precluded by the McCarran-Ferguson Act. The Court found the following factors important in that decision: 1) Nevada law provides both statutory and common law remedies to monitor insurance fraud; 2) The Nevada Unfair Insurance Practices Act is an administrative scheme that prohibits various forms of insurance fraud and misrepresentation. The Nevada Insurance Commissioner may issue charges if he believes the Act has been violated and may issue cease and desist orders and assess fines; 3) Victims of insurance fraud may also pursue private actions under the Unfair Insurance Practices Act; 4) the Act does not exclude application of other state laws, statutory or decisional and 5) parties may also recover punitive damages which could exceed the treble damages available under RICO. Id. at 311-312.

The Supreme Court concluded "we see no frustration of state policy in the RICO litigation at issue here. RICO's private right of action and treble damages provision appears to complement Nevada's statutory and common-law claims for relief." Id. at 313. The Court also noted that no Nevada state official had filed a brief at any stage of the litigation arguing that application of RICO would frustrate any state policy.

### D. Post-Humana Decisions

As noted above, in Humana, the Supreme Court clarified the test that Courts are to use in determining whether the McCarran-Ferguson Act applies. However, even with this clarification, courts have come to differing conclusions. In National Fair Housing Alliance, Inc. v. Prudential Insur. Company of America, 208 F.Supp.2d 46 (D.D.C. 2002), in a case involving the FHA and § 1981, the Court stated, "the Supreme Court has long held that it would defeat the purposes of providing a federal remedy for

7

discrimination if the 'assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state' proceeding." Id. at 61.  In that case however, the administrative agency was without authority to grant the requested relief.

However, in three cases involving RICO claims, courts have found that the McCarran-Ferguson Act did bar plaintiff's claims.  In LaBarre v. Credit Acceptance Corp., 175 F.3d 640 (8th Cir. 1999), the Court found that the McCarran-Ferguson Act barred plaintiff's claims against two insurers because Minnesota law permitted only administrative recourse and did not provide for a private right of action.  In Weiss v. First Unum Life Insur. Co., 416 F.Supp.2d 298 (D.N.J. 2005), the Court noted that neither New Jersey caselaw or statutory law permitted a private right of action for nonpayment of benefits nor allowed punitive damages.  The Court stated that these differences distinguished this case from the Nevada statute which was at issue in Humana.  The Court concluded, "application of the federal RICO statute would frustrate the stated policies of New Jersey's ITPA [Insurance Trade Practices Act] and interfere with the State's administrative regime." Id. at 303.   In Farthing v. United Healthcare of the Midwest, Inc., No. 98-4262-CV-C-9-4-ECF, (W.D.Mo. Feb. 29, 2000), the Court observed that in Missouri there is no private right of action for violations of insurance statutes and regulations, but that insurance companies were still subject to common law claims for fraud, breach of contract, breach of duty of good faith and fair dealing.  The Court also noted that punitive damages were allowed.  However, the Court determined, "[b]ecause the remedies provided under the RICO statute would frustrate, and perhaps even supplant, Missouri's comprehensive statutory scheme of insurance regulation, the McCarran-Ferguson Act bars plaintiff's RICO claim." Id. at 12.

8

However, in Moore v. Liberty National Life Insur.Co., 267 F.3d 1209 (11th Cir. 2001), cert. denied, 535 U.S. 1018 (2002), the Court found that plaintiffs claims under §§ 1981 and 1982 were not preempted by the McCarran-Ferguson Act. The Court came to that conclusion because it found the defendant had not demonstrated that:

> it is in fact the policy of Alabama to encourage or condone racial distinctions in the provision of life insurance. We have not been directed to any relevant Alabama authority that has required, condoned, or suggested that racial distinctions in the provision of life insurance are acceptable. Indeed, there is nothing in Alabama's insurance law that directs or encourages insurers to engage in such practices.

Id. at 1222.

Similarly, in Dehoyos v. Allstate Corp., 345 F.3d 290 (5th Cir. 2003), cert. denied, 541 U.S. 1010 (2004), non-caucasian policyholders brought suit alleging that Allstate used a credit scoring system that resulted in more expensive insurance policies being sold to non-Caucasians. In that case, the defendants argued that the application of the civil rights laws would frustrate the state insurance laws of Texas and Florida by interfering with the ability of those states to regulate insurance pricing policies. However, the Court noted that the defendants did not direct the Court to a particular law or declared regulatory policy, but only generally stated that the civil rights laws would frustrate and interfere with the ability of the states to regulate insurance rate making. The Court in DeHoyos found that this was not enough to withstand Humana scrutiny.

The Court stated:

> Appellants and their supporting amici have implicitly adopted the position that the Humana Court's use of the phrase 'or interfere with a State's administrative regime' means that if the state has a mechanism in place for performing an insurance-related function and the federal law enters that regulatory arena, then the federal law is 'interfering' with the state's

9

administrative regime. . . . "Interference," then, is not synonymous with "a presence in the regulatory field." For example, in Humana, the Court found that although states have administrative regimes and mechanisms in place to regulate insurance fraud, the question is not whether the state administrative regime has "occupied that field." Instead, the question is whether the regulatory goals are in harmony. RICO, the Court found, supplemented the state's mechanisms for eliminating insurance fraud, and consequently the purpose and goals of both RICO and the state insurance law were in alignment rather than conflict.

Id. at 299. However, in the dissenting opinion, Judge Jones disagreed, stating:

> The majority, in my view, fails to recognize that a disparate impact claim goes to the heart of the risk adjustment that underlies the insurance business. The Seventh Circuit cogently observed: "Risk discrimination is not race discrimination." NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 290 (7th Cir. 1992). Every insurer sets its prices according to the risk embodied in covering particular categories of customers. . . . The relevant inquiries are whether the price differential reasonably conforms to the risk differential and whether, in a regulated rate system, the insurer has received an appropriate return.

Id. at 300. Judge Jones stated that if plaintiff's claims were allowed to proceed and they were to prevail,

> any *post hoc* declaration that credit scoring is impermissible will require a federal court to determine, in order to assess damages, what a fair and "non-discriminatory" rate for the plaintiffs' policies would have been. A more complete overlap with the state insurance commissions' pricing decisions is impossible to conceive. Because of the sensitivity and complexity of the question of unfair policy price discrimination, both Texas and Florida have chosen not to permit plaintiffs to file individual lawsuits in state courts to challenge such decisions. . . . Instead, both states have enacted administrative corrective regimes. The plaintiffs' disparate impact suit will thus interfere with the initial rate-making as well as the corrective procedures utilized by the states.

Id. at 302.

### E. Does the McCarran Ferguson Act Require Dismissal of Plaintiffs' Price Discrimination Claims?

In their opinion, the Eighth Circuit raised several questions designed to answer

10

this question. The following are the responses to the specific questions raised:

### 1. Nature of Price Discrimination Claims

In the Revised Second Amended Complaint, plaintiff's specifically allege that:

> Farmers' failure and refusal to offer the same premium rates for homeowners insurance to homeowners in the Community as compared to homeowners in white communities had the intentional and/or unintentional unlawful effect of extracting higher premium rates from homeowners including Alma and John Hammonds, Kim Y. Nickerson, Esther E. Moten, and Kerry L. Butler who purchased homeowners insurance from Farmers.
>
> Farmers has charged the higher rates referred to in Paragraph 26 to homeowners in the Community in two ways:
>
> a. Farmers used a multi-tiered rate structure based in whole or in part on the racial composition of Kansas City zip code areas, notwithstanding the fact that (I) each Kansas City zip code area received the same municipal protection services and (ii) the Insurance Services Office had established only one rating territory for all zip codes in Kansas City which received the same municipal protection services.
>
> b. Farmers assigned and/or steered homeowners in the Community towards "standard" coverage programs offering higher rates and away from "preferred" coverage programs offering lower rates.

Id. at ¶¶ 26-27.

The plaintiffs defined the Price Discrimination Subclass as:

> **Price Discrimination Subclass:** All persons who, at any time between the commencement of the applicable limitations period and the date of trial, have owned a home located in the Community and purchased homeowners insurance from Farmers.

Id. at ¶ 29.

11

**2. Specific Relief Requested**

In their Prayer for Relief, plaintiffs ask for the following relief:

a) a declaration that Farmers' conduct violates the Fair Housing Act, the Missouri Human Rights Act and the Civil Rights Acts of 1866 and 1870; b) a permanent injunction preventing Farmers from any further conduct violating plaintiffs' rights; c) equitable and/or non-equitable monetary damages; d) punitive damages; e) attorney fees and costs.

**3. Missouri's Insurance Rate Regulation**

   **a. Whether Insureds May Bring An Action in State Court to Challenge an Insurance Rate as Discriminatory?**

Insureds may *not* bring an action in state court challenging an insurance rate as discriminatory. Missouri provides an exclusive administrative remedy for rate complaints. Mo.Rev.Stat. § 379.348 provides that an individual may request the insurer to review the manner in which the rate, plan, system or rule has been applied with respect to the insurance afforded him. If the request is not granted or if the individual disagrees with the action, then the individual may file a Complaint with the Director of Insurance and request a hearing. The Director may deny the hearing in certain circumstances. However, if the Director finds that the complaint charges a violation of Mo.Rev.Stat. § 379.017 and 379.316 to 379.361, and the individual would be aggrieved if the violation is proven, then the Director shall hold a public hearing. The Director is also enpowered to impose monetary penalties. In Shqeir v. Equifax, Inc., 636 S.W.2d 944 (Mo. 1982)(en banc), the plaintiffs brought a claim against American Family arguing that American Family in violation of Mo.Rev.Stat. § 379.118 had failed to give them written notice which accurately set forth the reason their homeowners' insurance was not renewed. The Missouri Supreme Court considered whether the Legislature

intended to create a private cause of action for violation of this statute. The Court concluded that it did not. Id. at 947.

Plaintiffs argue that Missouri's Unfair Trade Practices Act, Mo.Rev.Stat. § 375.944(4) and the Missouri Supreme Court in <u>Dierkes v. Blue Cross & Blue Shield of Missouri</u>, 991 S.W.2d 662, 667 (Mo. 1999) allow private parties to sue insurance companies for violations of standards of conduct not established by the Insurance Code. The Unfair Trade Practices Act states, "no order of the director under section 375.942 or order of a court to enforce the same shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this State." Mo.Rev.Stat. § 375.944(4). Plaintiffs argue that the Missouri Unfair Trade Practices Act defines "unfair discrimination" in the business of insurance as:

(c) Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to issue, refusing to renew, canceling or limiting the amount of insurance coverage on a property or casualty risk because of the geographic location of the risk;

(d) Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to issue, refusing to renew, canceling or limiting the amount of insurance coverage on a residential property risk, or the personal property contained therein, because of the age of the residential property;

Mo.Rev.Stat. § 375.936(11).

Additionally, plaintiffs argue that in <u>Dierkes</u>, 991 S.W.2d 662, the Missouri Supreme Court ruled that private actions against insurers were allowable. In that case, plaintiffs brought a class action alleging common law causes of action against Blue Cross and Blue Shield regarding the insurer's failure to secure state approval of increases in its premium rates for Medicare supplemental insurance. The Missouri

13

Supreme Court found that Blue Cross had represented that its policies met all "state and federal requirements" and that any change in premiums was "subject to all applicable laws and regulations." The Court stated:

> Through this system of regulatory compliance and enforcement, not private lawsuits, the legislature provides Missourians purchasing Medicare supplement insurance with at least a minimally fair deal. . . . In the absence of Blue Cross' voluntary promise to its policyholders to comply with "all" governmental guidelines, plaintiffs would have no cause of action. The trial court's dismissal of causes of action based solely on the statutory violation is affirmed. In the present case, plaintiffs are not suing solely for Blue Cross' violation of section 376.874, although compliance with that section becomes an element of the claim to the extent it is part of Blue Cross' promise. Instead, plaintiffs are suing for, among other things, fraud, breach of contract, unjust enrichment, and breach of duty of good faith, claims existing independent of the foregoing statute.

Id. at 667-668 (internal citations omitted).

Thus, the Court finds this case distinguishable because in the instant case, plaintiffs are not suing under common law causes of action, but rather under federal statutes. Dierkes is also distinguishable because in that case, Blue Cross made a specific promise to comply with *all* governmental guidelines and such is not the case here.

### 4. Whether Missouri Law Allows for Judicial Review of the Agency's Determination of these Issues ?

Missouri law allows judicial review of agency decisions through the Missouri Administrative Procedures Act. Mo. Rev. Stat. §§ 536.010 through 536.150.

## F. Would the Application of the FHA and Civil Rights Laws Frustrate Any Declared Policy of Missouri or Interfere With Missouri's Administrative Regime?

Farmers argues that if plaintiffs' request for declaratory relief is granted, it would

14

amount to a pronouncement that Farmers' compliance with the Rating Law violates non-insurance federal law. Relief that would prohibit Farmers from complying with the Rating Law would effectively invalidate the law and undercut Missouri's insurance laws. Additionally, Farmers notes that if the plaintiffs' request for monetary relief were granted, this would also impair the insurance regulatory regime. The Director of Insurance is charged with maintaining insurer solvency. The state regulates, monitors, examines and investigates the financial condition of insurers and imposes strict standards on the amounts of capital, reserves and surplus insurers must maintain. Farmers argues that the penalties the Director may impose and the preclusion of other forms of recovery from private citizens, is an important part of maintaining Missouri's insurance financial regulatory scheme. If private citizens were allowed to bring suits and seek monetary damages, this would greatly interfere with the state's regulatory system.

Plaintiffs argue that the goals of the FHA and the Civil Rights Acts are complementary to the Missouri Insurance Code. Plaintiffs state that the Missouri Insurance Code "prohibits insurers from setting rates that are 'excessive, inadequate or unfairly discriminatory." Plaintiffs state that racially discriminatory rates are by definition unfairly discriminatory. Thus, plaintiffs state the federal laws complement the state law. Additionally, plaintiffs note that Missouri permits private lawsuits arising out of other activities regulated under the Insurance Code. Finally, plaintiffs argue that the remedies under the Civil Rights Acts and the FHA are similar to those under Missouri common law. Plaintiffs state that if they prevail they would be entitled to make whole relief and if appropriate facts were proven, they might possibly recover punitive damages. Plaintiffs

15

state that these are the same types of damages as are sought by other common law or civil rights plaintiffs, including the types of suits authorized by the Missouri Supreme Court in Dierkes.

The Court does not agree with plaintiffs' assessment. Rather, as the Seventh Circuit noted in NAACP, 978 F.2d at 290, "Risk discrimination is not race discrimination." The Missouri Insurance Rating Law prohibits insurers from setting rates that are "excessive, inadequate or unfairly discriminatory." Mo.Rev.Stat. § 379.318(4). Farmers notes that the prohibition on unfairly discriminatory rates specifically prohibits insurers from using different rates for like risks and the same rates for unlike risks. Farmers states that to ensure that risk grouping is based only on the level of risk presented by each risk group, Missouri requires that in setting rates, insurers consider only those factors that legitimately demonstrate the actual risk of loss presented by the group. Additionally, insurers are required to file "every manual of classifications, rules, underwriting rules and rates, every rating plan and every modification of the foregoing which it uses and the policies and forms to which such rates are applied." Mo.Rev.Stat. § 379.321(1). Insurers are prohibited from issuing policies that are not priced in accordance with their filed rates. Mo.Rev.Stat. § 379.321(1) and (2). Additionally, the Director is empowered to "examine and inquire into all violations of the insurance laws of the state, and inquire into and investigate the business of insurance transacted in this state by any insurance agent, broker, agency or insurance company." Mo.Rev.Stat. § 374.190. Under Missouri law, the Director of Insurance is given the exclusive power to enforce the State's regulation of insurance rates and that if he believes that a violation has occurred then he may sanction the insurer by requiring them to cease using the

16

improper rate, imposing a penalty and/or suspending their license to do business in Missouri. Mo.Rev.Stat. § 379.361. Pursuant to Missouri law, the Director is given the authority to inquire and determine if a particular homeowners' insurer is using discriminatory rates.

If the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been. As Judge Jones noted in her dissent in DeHoyos, "[a] more complete overlap with the state insurance commissions' pricing decisions is impossible to conceive. Because of the sensitivity and complexity of the question of unfair policy price discrimination, both Texas and Florida have chosen not to permit plaintiffs to file individual lawsuits in state courts to challenge such decisions. . . . Instead, both states have enacted administrative corrective regimes." Id. at 302. Such is the case in Missouri. Missouri has a comprehensive system designed to monitor and manage the insurance industry and Missouri likewise does not allow private citizens to bring suits to challenge the pricing determinations of insurers. However, this does not mean that the plaintiffs are left without a remedy. If plaintiffs feel that they have been treated unfairly by an insurer or charged a higher premium than necessary, they may pursue their complaints through administrative channels. If the plaintiffs are allowed to proceed with their FHA and Civil Rights claims, this would clearly frustrate Missouri's Administrative regime to regulate the insurance industry.

In Humana, the Court found that the remedies under RICO were complementary with Nevada's laws which were designed to prevent insurance fraud. Both the RICO statute and the state laws allowed for private suits and punitive damages, thus the Court

17

found that there was no frustration of state policy. In the instant case, the FHA and Civil Rights laws and Missouri's insurance laws provide quite different remedies. The FHA and Civil Rights laws are enforced through private suits in which punitive damages may be awarded. However, private rights of action are not available under Missouri's administrative insurance regime and thus no punitive damages are available. In Weiss, 416 F.Supp.2d 298 (D.N.J. 2005) and In re Managed Care Litigation, 185 F.Supp.2d 1310 (S.D.Fla. 2002), the courts found these distinctions critical. In both of those cases dealing with the RICO claims, the state statutes did not provide for private causes of action nor allow punitive damage awards. Thus, the courts determined that the McCarran Ferguson Act barred the plaintiff's RICO claims because they found that the RICO statute would "frustrate the stated policies of New Jersey's ITPA [Insurance Trade Practices Act] and interfere with the State's administrative regime." Weiss, 416 F.Supp.2d at 303. Similarly, in DeHoyos, Judge Jones stated that "[t]he plaintiff's disparate impact suit will thus interfere with the initial rate-making as well as the corrective procedures utilized by the states." Id. at 302. The Court agrees and finds that plaintiffs' FHA and Civil Rights Act claims would interfere with Missouri's administrative insurance regime.

While it is the opinion of this Court that Missouri should provide its citizens with a direct legal avenue in which to assert their claims, this Court is nevertheless bound by the mandates of the McCarran Ferguson Act.

18

## IV. CONCLUSION

Therefore, for the reasons stated above, the Court finds that plaintiffs' claims are preempted under the McCarran Ferguson Act.  Accordingly, the Court hereby **GRANTS** Farmers' Motion to Dismiss Plaintiffs' Revised Second Amended Complaint (Doc. # 79).


Date:   3/16/07
Kansas City, Missouri

**S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
Chief United States District Judge